JOSEPH C. and SANDRA C. PALUMBO, ET AL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Palumbo v. Commissioner
Docket Nos. 14599-79, 14600-79, 4283-81, 4284-81.[1]
United States Tax Court
T.C. Memo 1985-566; 1985 Tax Ct. Memo LEXIS 64; 50 T.C.M. (CCH) 1427; T.C.M. (RIA) 85566; November 19, 1985. Douglas E. Little and Robert M. Musselman, for the petitioners. William L. Rinquette, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined the following deficiencies in Federal income taxes and additions to tax: Additions to Tax
Petitioner(s)
Year [2]
Deficiency
Sec. 6651(a) [3]
Sec. 6653(a)
Sec. 6653(b)
Joseph C. and
1972
$62,030.09
$31,015.04
Sandra C.
1973
123,822.76
61,911.38
Palumbo
1974
131,317.99
$6,555.71
1975
64,901.60
$6,536.54
3,278.45
Colter
1973
48,250.39
24,125.19
Corporation
1974
118,087.93
59,043.96
1975
68,278.88
3,828.08
1976
7,383.20
1,107.48
369.16
*65 The deficiencies result from numerous adjustments made in four statutory notices, many of which have been conceded by petitioners or by respondent. The parties also orally stipulated that a basis of settlement of all issues relating to Colter Corporation (Colter) has been reached, dependent in part on our disposition of issues affecting petitioners Joseph C. Palumbo (Palumbo) and wife, Sandra C. Palumbo (collectively petitioners Palumbo or the Palumbos). Most of the adjustments arise out of or are related, directly or indirectly, to the business activities of Palumbo as principal officer and stockholder of Colter. For convenience our Findings of Fact and Opinion are combined and are segregated by identifiable issues. [4] Most of the facts have been stipulated and are so found. *66 General
During the years in issue and at the time the petitions in each of the dockets were filed, petitioners Palumbo resided in Charlottesville, Virginia. Colter is a corporation organized under the laws of the State of Virginia. During the years involved and at the time the petitions were filed, Colter had its office and principal place of business in Charlottesville, Virginia. During the period 1972-1976, Palumbo owned 75 percent of the stock of Colter, and Mrs. Palumbo owned the remaining 25 percent. Both petitioners Palumbo and Colter were licensed life insurance agents or brokers. The principal activity of Colter (and of petitioners Palumbo) and Colter's principal source of income during this period was the sale of life insurance for commissions as an agent of various issuers of life insurance including American Defender Life Insurance Company (American Defender), Bankers Security Life Insurance Society (Bankers Security), and Shenandoah Life Insurance Company (Shenandoah). Colter was organized in 1965 to become the vehicle through which life insurance was sold by petitioners Palumbo. It was, in general, Palumbo's intent and that of his independent certified *67 public accountant, James B. Hoover (Hoover), [5] that all of Palumbo's life insurance selling activities would be through and on behalf of Colter. It was also the plan and intent of petitioners Palumbo and Colter that Palumbo and Mrs. Palumbo should be paid salaries by Colter rather than commissions for their work. All commissions on insurance policies sold by them in their capacity as employees of Colter belonged to Colter as its income.Respondent has not challenged the propriety of this arrangement. Rather the deficiencies in many respects are predicated on alleged failures to follow this established arrangement. On the recommendation of Hoover, an account was set up on Colter's books, described as the "loan account," to be used to record financial transactions between the Palumbos and Colter. In many instances Colter *68 paid expenses for the Palumbos which did not constitute business expenses of Colter and in many instances Palumbo personally paid debts or obligations of Colter or incurred and paid expenses properly reimbursable by Colter. These were recorded as debits or credits to the loan account. In every year since 1966 this account has had numerous debit and credit entries. No interest was ever charged or paid with respect to the annual balance in the account. The parties have stipulated that Colter maintained four "so-called divisions" which were: (i) 1500 North, which handled Colter's rental properties; (ii) the Medical and Dental Career Fund, which handled life insurance sold to doctors, dentists, and medical students; (iii) the Eastern Loan Corporation, an incorporated entity which handled the American Defender account within the Medical and Dental Career Fund; and (iv) the Nespal Company, which handled life insurance policies sold in the Virgin Islands. These divisions were at the least trade names under which Colter carried on aspects of its business. [6] Colter also utilized other trade names including "Commonwealth Agency" and "Monticello Agency." *69 The normal commission arrangement between Colter and the insurance underwriters for which it sold insurance entitled Colter to 85 percent of the first-year's premium payable on each policy by the insured policy holder, 15 percent of the second-year premium, and a smaller percentage for the third through the tenth years provided the policy did not lapse for nonpayment of premiums. In the case of American Defender, Colter also received an annual production bonus at a rate of $3 per thousand face amount of policies sold, which translated into about 15 percent of the premiums. Thus, whenever earned, the production bonus gave Colter 100 percent of the first-year's premiums on American Defender policies. Nespal Company
Sometime during the year 1971, Palumbo and another Charlottesville insurance agent, Harrison Nesbit II (Nesbit), agreed to sell group insurance to Government employees in the Virgin Islands, using American Defender as the underwriter. The business was conducted in the name of the Nespal Company which the parties have stipulated was a joint venture. [7] The license to sell insurance in the Virgin Islands was issued in the name of the Nespal Company (Nespal) and apparently *70 the Virginia State Corporation Commission also licensed Nespal to sell insurance. There is no evidence that any formal partnership agreement was ever entered into with respect to the joint venture. Nesbit withdrew from it in the latter part of 1973. All of the books and records relating to Nespal were maintained by Colter employees and all transactions were recorded on Colter's books. One of Colter's vice presidents was actively involved in the business activities of Nespal at least from some time in 1973. Palumbo was also actively involved. Other than work performed by Nesbit, either for his own account or for the account of his wholly owned corporation, and the activities of two salesmen who resided in the Virgin Islands, all activities of Nespal were handled by Palumbo or by Colter employees. To the extent that income and expenses of Nespal activity were reported for Federal income tax purposes, they were reported by Colter, *71 which aggregated those items for the years 1972, 1973, and 1974 (presumably through April 30, 1974) on Colter's fiscal 1974 tax return. The key issue is the capacity in which Palumbo acted, as a Colter employee or individually. Respondent contends that Palumbo entered into this activity individually as a partner with Nesbit and that on Nesbit's withdrawal Palumbo continued the activity as the sole proprietor or perhaps as a joint venturer with Colter. If we agree with respondent on this point, the parties have stipulated the proper increase in the income of Palumbo for 1972 and 1973. Although not free from doubt, on the basis of all the evidence before us, we find that in this life insurance selling activity Palumbo was acting as an officer and employee of Colter. If a partnership or joint venture did in fact exist with Nesbit, it was between Colter and Nesbit or possibly Goldine, Nesbit and Company, a corporation owned or controlled by Nesbit. [8]
*72 It would have been inconsistent with other insurance sales activities for the Nespal business to have been handled by Palumbo personally. The Accountant [9] understood the joint venture to be between Colter and Nesbit (or perhaps Nesbit's wholly owned corporation). The minimal written evidence in the record refers principally to Nespal as a separate entity, even in 1974 when the joint venture with Nesbit had ended. American Defender issued checks to "Nespal Company" but those acting for Nespal were full-time employees of Colter, and the address of Nespal was the same as Colter's. Commission payments from American Defender were received by Colter, either in its own name or in the Nespal name. American Defender maintained a commission account in the name of Nespal. There appears to have been separate bank account in the Nespal name, apparently handled by Colter employees. It is also significant that disbursements from this Nespal account to either of the Palumbos were credited to the loan account, which again is consistent with the business being that of Colter not Palumbo. The burden of proof on this issue rests with petitioners Palumbo. *73 We are satisfied that they have discharged that burden. We find for petitioners on this entirely factual issue, that Nespal income and expenses belong to Colter, not to Palumbo. Accordingly, the appropriate stipulated adjustments will be taken into account under Rule 155. Loan Account
For the years 1972 through 1975, respondent determined that certain increases in the amount of the loan account, that is the excess of debits over credits, at the end of each calendar year, constituted constructive dividends to Palumbo in the following amounts: 1972
$58,716.30
1973
$90,135.66
1974
$56,433.57
1975
[10] $52,605.67
*74 The table set out in Appendix A hereto reflects the account balance of the loan account at the end of each of the fiscal years of Colter (except for fiscal 1971) and reflects the net changes in the account at the end of each fiscal year. Since the Palumbo adjustments are as of December 31, the Colter figures are not comparable to the Palumbo adjustments. In each year there were very large debits for payments passing from Colter to Palumbo as well as very large credits for payments from Palumbo to Colter. These payments from Palumbo in 1972 were in excess of $200,000, in 1973 in excess of $500,000, and in 1974 in excess of $300,000. Thus in each of the years, the net of the components in the loan account treated as constructive dividends by respondent for purposes of this adjustment reflect a substantial number of transactions passing both ways.There was never any agreement between Palumbo and Colter as to the payment of interest on the balance in this loan account nor was there ever any written reflection of the balance by promissory notes or board of director action. However, the account has been handled consistently from 1966 through 1977, apparently as intended by the Accountant, *75 although numerous errors have been made. As stated by respondent the issue is whether at the time of the withdrawals Palumbo had an intent to repay. Respondent relies on Baird v. Commissioner,25 T.C. 387 (1955) and Haber v. Commissioner,52 T.C. 255 (1969), affd. per curiam, 422 F.2d 198 (5th Cir. 1970) among other cases. We recognize, as respondent does, that whether a withdrawal is a bona fide loan or a distribution of a dividend is a factual question, depending on the intent at the time of the withdrawal. When the parties involved are in control of the corporation, "a special scrutiny" is indicated. Haber v. Commissioner,supra at 266. Petitioners rely on cases such as Sharp v. Commissioner, a Memorandum Opinion of this Court dated July 20, 1953, where as also recognize that no two cases are exactly alike. On this issue we find for petitioners. We are convinced by the written evidence and by the testimony that the account was set up and was operated consistently over the years to reflect transactions between Palumbo and his corporation, always with the intent to bring the account back to zero. The *76 record keeping was poor, but that characterizes this case in every aspect. Palumbo's style of doing business was to sell insurance, almost irrespective of the lengths to which he had to go or the cost to Colter of doing so. Palumbo frequently made side agreements with insureds in order to sell insurance which in some cases amounted to indemnifying the insured from premium expense and, at least in one instance, using insurance sales as a mechanism for loans to an insured. There were numerous mistakes made in the recording of entries and in the analysis of the loan account at the end of each year by the Accountant. Palumbo certainly contributed to these mistakes by his own irresponsible methods of doing business. Respondent argues that Palumbo used Colter's bank account as his own. We add that he also used his own bank account as Colter's. Respondent also argues that, were it not for his investigation of Palumbo and Colter, the account would never have been brought back to zero. We do not agree. While the Accountant must share responsibility for may of the mistakes, we do not doubt the good faith and integrity of Hoover and his associates. When one taken into account the magnitude *77 of the insurance placed by Colter during these years, the size of the loan account is at least understandable. We find as a fact that it was intended to record the indebtedness of Palumbo to Colter and of Colter to Palumbo and that the balance was always recognized as a receivable or payable, as appropriate. Thus, we hold that these sums are not dividends to Palumbo. Erroneous Credits and Reconciling Entries
In each of the 4 years, respondent has treated certain erroneous credits and reconciling entries to the loan account as constructive dividends in the following amounts: 1972
$ 9,504.53
1973
$47,834.31
1974
$51,375.48
1975
$10,000.00
Both parties agree and they have stipulated that each of the entries comprising these amounts was an erroneous or arbitrary entry. When discovered they are corrected by adjusting entries in later years. For example, in Colter's 1972 fiscal year, Palumbo was credited with making payments on Colter obligations in the amount of $31,368.81. In fact, Palumbo paid only one of the four Colter obligations which comprise this amount but Palumbo paid other obligations. The adjusting entry should have been $21,864.28 rather *78 than $31,368.81. Respondent treated this difference, approximately $9,500, as a constructive dividend. Another aspect of this adjustment arose out of the Accountant's year-end reconciling entries. As part of the year-end routine, the balances of indebtedness to banks shown on Colter's books were confirmed with the banks. The loan account was adjusted for any differences on the assumption that discrepancies resulted from payments by Palumbo since he had personal liability to the banks on such obligations. Whether or not this assumption by the Accountant, set forth in the stipulation, was justified is immaterial. It does not convert these particular adjustments to the loan account into dividends. No useful purpose would be served by discussing in endless detail each of the adjustments comprising this issue. It is controlled by our analysis of the loan account. Accordingly, we find for petitioners on this issue. There was no intent on the part of Colter or Palumbo to divert funds to Palumbo through the use of the loan account. The mere fact that errors were made in debits and credits does not convert those adjustments into a constructive dividend. The cases cited by respondent *79 are simply not on point. For example, Hash v. Commissioner,273 F.2d 248 (4th Cir. 1959), affg. a Memorandum Opinion of this Court, recognizes that there was no evidence in the case to indicate that the increase in the account receivable was ever intended to be reversed by repayment by the taxpayer. That case is simply not our case. Commission Adjustments
Respondent has determined that a portion of the items shown on Colter's books under the heading "commission adjustments" are taxable to Palumbo as constructive dividends. These adjustments are in the following amounts: 1972
$28,353.00
1973
$16,272.65
In addition, for reasons which we cannot determine, respondent in his statutory notice for the year 1974 treated two commission adjustments in the respective amounts of $13,425 and $1,000, totaling $14,425, as erroneous credits to the loan account. We prefer to treat these items as Colter treated them on its books and as argued by petitioner on brief, that is, under the heading of commission adjustments. Palumbo operated Colter's business on the theory of mass production, with the result that during the period from 1972 through 1975 Colter *80 sold annually approximately $48 million worth of life insurance with a premium income of approximately $1,400,000 cumulatively for those years. However, in order to achieve this record, Palumbo was required to make all kinds of side agreements or arrangements with prospective insurers and/or with their employers. These included, from time to time, the payment of all or a portion of premiums out of Colter's commissions, endorsing bank loans used to pay premiums, assistance in business activities such as arranging for business loans, and, in some cases, rebating premiums as gifts or loans. In addition, to achieve the production bonus from American Defender, Colter was required to keep a high percentage of its policies in force for 2 years. Hence, there was a business incentive to make certain the second-year premium was paid. It was Colter's practice to record on its books under the heading "Commission Adjustments" amounts of commissions which were repaid to the insurer either directly as payments on premiums or as an offset to the premium obligation. In the year 1972, constructive dividends resulting from commission adjustments involved three policies. One of the adjustments, *81 in the amount of $4,000, respondent has now conceded. The 1973 adjustments involve the other two 1972 insureds and three other insureds. Petitioners have conceded one of the 1973 adjustments in the amount of $330.53. One of the other two insureds, involving the years 1972 and 1973 was George Gilmer, Jr. (Gilmer). Gilmer already had adequate life insurance but with a high premium due to a medical condition. He agreed to apply for a policy through Colter on Palumbo's representation that the premium might be reduced and, if not, Gilmer would not be expected to pay the premiums. Hence, Colter itself paid American Defender the 1972 first-year premium of $3,663. Colter in November 1972 received commission income on account of this policy of $3,113.55. Colter also received the extra production bonus in the year 1972. Hence, Colter in effect used its entire commission to pay the first-year premium. The premium was not reduced and for the second year Palumbo agreed to pay the premium himself.Gilmer caused the beneficiary to be changed from his estate to a partnership between Palumbo and Gilmer. Colter actually paid the second-year premium after deducting the commission of $549.45 and *82 charged Palumbo's loan account with the net premium payment of $1,010.32. The policy lapsed the next year after Palumbo unsuccessfully sought to persuade Gilmer to continue the policy. Colter deducted as a commission adjustment $3,663 on its fiscal 1973 tax return. We are not informed whether Colter took into income or deducted as a commission adjustment its second-year commission of $549.45. Respondent treated amounts equal to the first-year premium and the second-year commission as dividends. The third 1972 commission adjustment relates to a policy issued on the life of James C. Gardner (Gardner). Gardner was in the motel business and had some connection with an entity known as Family Inns of America, which leased a motel in South Carolina from Florence Family Inns Limited Partnership (the partnership). A corporation wholly owned by the Palumbos was a general partner with a 25-percent interest in the partnership. There is no evidence as to ownership of the remaining interests in the partnership. The corporation, Real Property Investors, Inc., was as of the date of trial still in business. The policy was owned by and the named beneficiary was Family Inns of America. Colter *83 paid the first-year premium of $20,690. In the latter part of the first 12 months, after Family Inns of America ceased to operate, the policy was assigned to the partnership. Colter paid American Defender the first-year premium in the amount of $20,690 which it deducted as a commission adjustment. It received a first-year commission of $17,586.50 plus a $3,000 production bonus and received a second-year commission in the amount of $3,103.50. The record is silent as to the source of payment of the second premium although it seems safe to assume that the partnership as owner paid at least part of it. [11] Gardner also was the insured and owner of another American Defender policy with the premiums financed by a North Carolina bank. Colter endorsed the note evidencing this financing but was not called upon to make any payment on its endorsement. On the second policy, Colter received commissions and production bonuses amounting to almost $25,000. The facts do not reflect whether the commission due on the second-year Gardner policy was taken into income by Colter. Respondent taxed to Palumdo the first-year premium and second-year commission. We do not know the theory pursuant to which *84 respondent taxed to Palumbo these two premiums although we surmise it related in some fashion to his indirect interest in the partnership. In another instance, Palumbo, on behalf of Colter, sold a policy to a Robert F. Roland (Roland) who was a Vice President of Allegheny Air Lines and Chairman of the Board of its credit union. Through this connection, Colter sold substantial additional life insurance to employees of Allegheny Air Lines. The first-year premium on the Roland policy was paid in 1972 by Colter in the amount of $1,995 and in this instance Colter, for reasons unknown, deducted the amount as legal or professional expense on its fiscal 1973 income tax return instead of treating the amount as a commission adjustment. Colter also paid a second-year premium of $424.57 to American Defender. This payment was recorded as a commission adjustment. Over the 10 years with respect to which *85 Colter was entitled to receive premiums on this policy, Colter received $2,741.07. The premiums were taxed as dividends to Palumbo. In 1974, Colter sold two policies to Central Produce, Inc., insuring the lives of two of its employees who are cousins of Palumbo.Palumbo had no interest in the corporation of any kind. Neither is there any evidence that he or Colter had any business dealings with the corporation or its employees other than the sale of life insurance. Prior to this period the company had purchased policies of life insurance on its employees through Colter. The premiums on the policies sold in 1974 totaled $19,425 of which Colter paid $13,425, which it treated as a commission adjustment. [12] It received commissions of $15,540 plus the general agent's bonus from American Defender. Respondent treated the sum of $13,425 as a constructive dividend to Palumbo. *86 In October 1973, Lester Terry (Terry) who was manager of a restaurant owned by a corporation, of which the Palumbos were the sole shareholders, purchased a policy which lapsed during 1976. During that period Colter earned commissions of $1,764.54, plus the bonus. In January 1974 Colter loaned Terry the sum of $1,000, which loan was not repaid as of the date of the trial, and, in February 1974, sold two additional policies on Terry's life. A corporation which we assume owned the restaurant was a beneficiary of both policies and owner of one. An individual whom we assume to be the wife of Terry owned the other. These policies lapsed in 1979 but, prior thereto, Colter earned commissions totaling $2,698. The $1,000 loan by Colter was taxed to Palumbo as a constructive dividend. Respondent's arguments for constructive dividend treatment are illustrated by our decision in Silverstein v. Commissioner,36 T.C. 438 (1961), one of a number of similar cases cited on brief. The following quotation, at 443, states the rule: It is equally well settled that if a corporation pays an obligation of its stockholder or makes a payment for his benefit, the payment made constitutes *87 a taxable dividend to ther stockholder, and this is true even though there has been no formal declaration of a dividend, the distribution is not reported on the corporate books as such, it is not in proportion to stockholdings, and some of the stockholders do not participate in its benefits. * * * Petitioners do not disagree as to the law. We look to find an economic benefit to Palumbo and not to Colter. If present, Colter's payment may constitute a constructive dividend. In the case of Gilmer, the motivation for sale of the policy was clearly appropriate to Colter's insurance business. Whether or not as to Colter the payment of the premium was a proper deduction under section 162 is not before us, but respondent does not suggest any illegality in an agent paying or advancing for an insured payment of the first-year's premiums. This was an apparently legitimate if unsuccessful effort to sell insurance. There is no explanation in this record as to how the second-year commission was treated by Colter. Colter did have a business purpose in paying the second-year premium since the production bonus was refundable as to any policy which did not remain in effect for at least 13 *88 months. Respondent does not argue for different treatment of the sum of $549.45 than the first-year premium of $3,663. We find that this policy was Colter business, that maintaining the policy in effect for the second year was also in Colter's interest, with no significant economic benefit to Palumbo. The temporary benefit received by Palumbo during the second year during which he had some ownership interest in the policy was inconsequential. This strategy was used simply to keep the policy alive for Colter's benefit. Hence, as to Gilmer we find for petitioners. Similarly, the Gardner policy facts seem clearly to represent Colter business, handled in accordance with practices normal to Colter. Whether there was in fact any real benefit to the partnership from a policy held by Family Inns of America we cannot tell. But even if there were, as was the fact in the policy's second year, we have no factual basis here to find the kind of direct benefit to the shareholder with no benefit to his corporation which would warrant dividend consequence. The same is true of the Roland matter. The fact that Colter placed the deduction in the wrong account is irrelevant to this issue.Neither *89 do the Central Produce, Inc. transactions justify a different result, even if the fact is that Colter rebated a part of the premiums. Our focus is upon Palumbo not Colter. We find for petitioners on these adjustments. With respect to Terry, we find the record to be too incomplete to find the Terry loan to be a business transaction of Colter. There is no indication that the $1,000 loan to Terry was in any fashion tied in to sale of insurance on his life. It is simply unexplained; as a consequence, petitioners have not discharged their burden of proof. Rule 142(a). On its books in the year 1973, Colter also treated as commission adjustments payments of $6,864.60 and $5,000 in connection with insurance policies issued to Thomas Regan (Regan). The facts as to these policies are, however, different from the foregoing. Regan is the brother-in-law of Palumbo and during the relevant period of time was serving as an official of the Small Business Administration (SBA) in its Richmond, Virginia office. Regan, Palumbo, and others were indicted on various charges basically stemming from apparent efforts to bribe Regan to act favorably on loans in his official capacity. Palumbo plead *90 guilty to one count of the indictment. Those matters appear to be unrelated to adjustments here discussed. Sometime in 1972 Palumbo requested that Wyatt Owens (Owens), an executive of Colter, write a check payable to Regan on his (Owens) personal bank account for the sum of $3,500 which check Owens gave to Regan. Palumbo thereafter reimbursed Owens for this expenditure. Palumbo asserts that this was an indirect method of loaning money to Regan. Apparently, this transaction did not effect Colter's books and is not the subject to any adjustment against Colter or Palumbo, although the $3,500 allegedly was equivalent to a portion of a premium on a policy written by Colter on Regan's life. The premium was paid by a loan advanced by First Citizen's Bank in Charlottesville against a note signed by Regan and co-signed by Colter. Thereafter, in the fall of 1972, another policy on the life of Regan was approved by American Defender and apparently financed by the same bank in a similar fashion. Again Owens, at Palumbo's direction, issued three checks, two in the amount of $1,500 and one in the amount of $2,000, which checks were made payable to cash and were delivered to Regan. Apparently *91 Palumbo again reimbursed Owens but, in this instance, Colter reimbursed Palumbo in the amount of $5,000 either in cash or by an adjustment to the loan account. Colter also paid to Palumbo, by check dated April 30, 1973, the amount of $6,884.93 which was equivalent to a particular item of commission income which was received by Colter on the Regan insurance policy. Respondent argues that this latter amount was also transmitted to Regan but we find no convincing evidence of that in this record. What is markedly different from the other commission adjustment items discussed above is the fact that in the Regan case the two payments of $5,000 and $6,864.60 were actually transmitted by Colter to Palumbo by check in connection with matters apparently totally unrelated to Colter's business. Whether these sums were loans, gifts, or bribes to Regan, if in fact he received the sum of $6,884.93, we cannot determine. But there is simply no evidence that payment of these sums to Palumbo served any corporate purpose of Colter. In fact, petitioners in their reply brief took no exception to respondent's requested finding of fact that "The said amounts $5,000.00 and $6,884.93 referred to above *92 in paragraphs 124, 125, and 126 were expended by petitioner Joseph C. Palumbo for his own personal purposes and benefit." This is in substance a concession by petitioners; their half-hearted attempt in their reply brief to argue against constructive dividend treatment confirms a constructive concession. In any event, such sums are clearly taxable to petitioners as constructive dividends both under section 61 and by reason of the burden of proof. By way of summary of this issue, therefore, for the year 1972 with respect to the three items aggregating $28,353, we hold for petitioner on the Gilmer and Gardner items, respondent already having conceded the Pearlman $4,000. For 1973, we hold for petitioner on the Gilmer item, and on the Roland item in the amount of $424.57. Petitioner conceded the Bickers adjustment and wse hold for respondent on the two items totaling $11,884.93. For 1974 we hold for petitioners on the Central Produce item and for respondent on the $1,000 Terry loan. Research Concepts, Inc.
Prior to 1972, Palumbo sold a substantial amount of key man insurance to the principals of a corporation known as Remote Console Information Corporation (Remote) with most *93 of the premium on the policies being financed by bank loans presumably guarantied by Colter or Palumbo on Colter's behalf. In August 1972, Remote formed a wholly owned subsidiary, Research Concepts, Inc. (Research) which entered into one or more contracts with the United States (the National Commission on Marijuana and Drug Abuse) to perform research. Remote borrowed from a bank for its eoperating expenses on a note endorsed by the president of Remote and by Palumbo. In October 1972, Remote and Research applied jointly to the SBA for a $200,000 bank loan to be approved and guaranteed kby the SBA, which was done. Palumbo became a guarantor of that loan up to the sum of $150,000. Remote was thereafter threatened by bankruptcy and as a result it entered into an agreement with Palumbo pursuant to which Palumbo received all of the stock of Research together with drug study contracts and Research assumed certain liabilities of Remote including the $200,000 SBA loan (now guaranteed 100 percent by Palumbo), some $117,000 in key man insurance policy loans and $19,000 that was owed to Palumbo. In 1973 Research received payments from the United States on the drug study contract which sums *94 were used for its debt and expenses. No income tax return was filed by it for the calendar year 1973; rather, the income and expenses were reported on Colter's fiscal year 1974 income tax return. The statutory notices have treated payments by Colter on debts of Research as dividend income to Palumbo. These adjustments are as follows 1973
$24,455.42
1974
$56,567.39
1975
$46,239.23
In addition, an adjustment in Palumbo's favor to the loan account in the amount of $22,494.30 for expenses paid by Palumbo on account of Research was treated as part of a larger dividend adjustment for 1974. The stipulation recites that "the parties agree that the only question to be resolved with respect to this adjustment and issue, is whether Research Concepts, Inc. is a division of the Colter Corporation." Notwithstanding that there is not one shred of evidence to show that it was ever intended that Colter become the owner of the Research stock, but on the strength of convoluted testimony by Colter's Accountant, petitioners argue that Research should be treated as a division of Colter. On this issue we find as a fact that Research was owned solely by Palumbo after divestiture *95 by Remote, and was not, and was never intended to be, a division of Colter. This is purely a fact question. On this record there is no basis for any other conclusion. By reason of the stipulation, we make no other findings. [13]
*96 The loan account adjustment of $22,494.30 is another matter. During the period from December 1, 1970 through February 9, 1973, Palumbo advanced personally to Remote $22,494.30. We assume that the debt to Palumbo assumed by Research of $19,000 represented the balance of these advances. The accountant in adjusting the Colter loan account for 1974 included the sum of $22,494.30 as a credit to the loan account, thus reducing Palumbo's liability to Colter. This treatment was consistent with the Accountant's theory that Research, after Palumbo's acquisition of its stock, should be treated as an integral part of Colter. The basis for this theory was that the Palumbo-Colter connection with Remote was to sell key man insurance to Remote which Colter did. We note that respondent does not treat this adjustment in either of his briefs although petitioners treat it as similar to the other Research adjustments discussed above. This adjustment is not governed by that part of the stipulation referred to above which is to be resolved on the basis of our determination as to whether Research was a Colter division. On the contrary, this item as we see it was simply an erroneous adjustment to *97 the loan account by the Accountant, but made in good faith. See discussion under the the heading "Erroneous Credits and Reconciling Entries" above at page 12. While this determination was erroneous it, nevertheless, does not warrant treating the adjustment as dividend income to Palumbo. Thus, we hold for petitioners on the 1974 adjustment in the amount of $22,494.30 treated in the 1974-1975 explanation to the statutory notice as part of item (b)(6). Trans-Ocean Steel Corporation
Trans-Ocean Steel Corporation (Trans-Ocean Steel) and Laurent of the South were in 1973 (according to stipulation) independent corporations in which neither Palumbo nor Colter had any interest. However, both corporations received loans approved by Regan for SBA. It was ultimately determined that these loans were approved on the basis of false information. On April 24, 1973, shortly after the approval of the Trans-Ocean Steel loan, a contract was entered into between Trans-Ocean Steel and Research for an inventory study which respondent contends was a sham caused by the investigation of these loans by the SBA. On the same day, a check was drawn by Trans-Ocean Steel payable to Research in the amount *98 of $17,500. The check was cashed by Palumbo personally. On April 27, 1973, a cashier's check for $8,500 was sent by Palumbo to Charles Calabrese. Calabrese is a cousin of Palumbo and was instrumental in arranging one or more of these loans. On May 15, 1973, I.D.I. Corporation (not otherwise identified in this record) issued a check to Palumbo personally in the amount of $17,500. [14] Shortly thereafter, another cashier's check was sent by Palumbo to Calabrese in the amount of $8,500. Colter treated both of the $17,500 payments as income to it, the first payment being recorded as income from services performed by Research pursuant to the contract and the second as commissions on insurance premiums on key man insurance written for Willow Street, another corporation otherwise undescribed. Both of these sums were also charged to Palumbo on the loan account, thus confirming that Palumbo actually received the funds. In November 1973, Colter paid the premium on an insurance policy on a Willow Street officer *99 in the sum of $7,630. In 1974, it paid by check to Willow Street or to one of its officers two sums in the amounts of $3,500 and $6,370. The three payments totaled $17,500 and the three sums were on Colter's books treated as commission adjustments. The only adjustment in the statutory notice related to this matter is the determination that the $17,500 payment from Trans-Ocean Steel is income to Palumbo. While arguably the $17,500 check to Research should have been its income, no one disputes that Palumbo cashed the check personally and apparently took possession of the funds. No claim was made that he is entitled to a business deduction for the two sums of $8,500 which he transmitted to Calabrese. Petitioners argue that in some fashion Palumbo did not receive any benefit personally from the $35,000 since he was merely a conduit for the funds going to Calabrese and, in some fashion not disclosed by the record, $17,500 was transmitted to Colter. [15] There are some indications in the record that Palumbo may have been a participant in bribing Regan and helping businesses improperly secure SBA loans and Calabrese may also have been a participant. Thus, the payments to Calabrese *100 may have been compensation for his participation in illegal transactions. However, we cannot on this record make adequate findings of such facts [16] and, even if we could, they would not be dispositive of this issue. As we have found, Research was not a division of Colter but a separate entity owned by Palumbo. The fact that Colter took into income these two $17,500 payments is simply immaterial from the standpoint of Palumbo's tax liability. The stipulated facts establish that the $17,500 funds received from Trans-Ocean *101 Steel was appropriated by Palumbo. Petitioners have failed to carry their burden of showing that the statutory notice is incorrect in this respect. Rule 142(a). There is nothing except the coincidence of time to connect either payment to Calabrese with the receipt by Palumbo of the two payments of $17,500. There is insufficient evidence to establish an agreement or understanding between Palumbo and Calabrese that he would be entitled to one-half of each $17,500 payment and, even if there were, the balance of each payment was retained by Palumbo. Petitioners have failed to prove that Palumbo was acting as a conduit with respect to one-half of the Trans-Ocean Steel check. We find for respondent on the Trans-Ocean Steel issue. Insurance Policies
Respondent determined dividend income to petitioners in the amount of $33,002.70 for 1972 and $3,162.30 for 1973 as a result of transactions involving Bankers Security, Shenandoah, and American Defender. Although contending that the adjustments with respect to Bankers Security and American Defender were intended to be added to the loan account, and the parties put in evidence a memorandum which apparently was given to the Accountant, *102 but was not taken into account in preparing Colter's returns, petitioners have conceded on brief these two adjustments. The Shenandoah adjustments ($15,144.70 in 1972 and $3,162.30 in 1973) arose in the following circumstances. Shenandoah treated Palumbo as an employee and as a result withheld taxes on commission income nominally earned by Palumbo but actually earned, as we have found, by Colter. In 1972, $468 of FICA taxes was withheld and in 1973 $631.80 was withheld. Colter subtracted these withheld taxes from the commission amounts received by it and did not report the withheld taxes as its income. In those 2 years, however, Palumbo took credit on his income tax returns for the amounts of withheld tax. On brief petitioners do not discuss this matter although the facts are not in dispute since they are stipulated. The commission payments belonged to Colter and were taxable to it. The fact that there were taxes withheld by Shenandoah was an error which should have been corrected. Instead Palumbo clearly appropriated this amount of Colter's funds to his own use. To the extent that petitioners are not deemed to have conceded this item by the failure to argue it on brief, *103 we find that respondent's determination is certainly correct. Section 61. The two remaining adjustments arise out of an insurance policy issued by Shenandoah on Palumbo's life with respect to which Mrs. Palumbo was both the owner and beneficiary. At Palumbo's request, Shenandoah netted the commission due to Colter against the premium on the policy. As a result, Shenandoah withheld commissions in the amounts of $14,676.70 in 1972 and $2,530.50 in 1973. The balance of each year's premium was paid by Palumbo personally. No part of the retained commissions was credited to the loan account. Thereafter, the policy was assigned to Virginia National Bank as security for loans either of Colter or Palumbo or both and ultimately the policy was allowed to lapse. On these facts, Palumbo again appropriated to his own benefit commission income of Colter which would clearly be taxable income to him in the respective years. However, although there is nothing in any of the exhibits in the case to so indicate, the parties have stipulated that the policy in question was a "split-dollar" policy which is an arrangement between an employer and an employee in which the employer provides funds to *104 pay part of the annual premium, to the extent of the increase in the cash surrender value each year, and the employee pays the balance of the annual premium. The employer is entitled to receive out of the policy proceeds an amount equal to the cash surrender value or at least an amount equal to the funds it provided for the payment of premiums. [17] The parties have also stipulated that the "split-dollar" cost of the policy, that is, that element of the premium which the employee is required to pay, was, in 1972, the sum of $2,720 and, in 1973, $2,915. As petitioners argue on brief, Palumbo paid in 1972, $2,193.30 and in 1973, $14,339.50. Thus, in 1972 based on the stipulation, Palumbo personally paid all but $527.70 of that portion of the premium he was required to pay, while in 1973 he paid substantially more than he was required to pay. Because the policy was assigned to Virginia National Bank as collateral for obligations of Colter, as well as Palumbo, and because, in fact, Palumbo paid more than the required share of the premium in 1973, petitioners argue that neither of these adjustments should be sustained. In his original brief, respondent simply ignores the stipulation *105 that this was a "split-dollar" policy. In his reply brief, respondent acknowledges that these "split-dollar" costs applicable to the employee as set forth in the stipulation are correct but argues that the policy was not "obtained in the proper manner." The burden of proof on this issue is on petitioners. Rule 142(a). As we have pointed out, there is absolutely nothing in the record other than the stipulation to indicate that this was a "split-dollar" policy. The application for the policy does not so indicate and there is no evidence of any agreement between the employer Colter and the employee Palumbo as to a sharing of the policy proceeds. However, apparently respondent was satisfied to stipulate to the conclusion without requiring that the facts as to arrangement between Palumbo and Colter, if any, be set forth in the stipulated facts. Under the circumstances, respondent is bound by the stipulation even though not supported by the record. Respondent, had he wished us to ignore the stipulation, had at least the burden of demonstrating that the record was inconsistent with the stipulated facts and more specifically *106 explaining why this insurance policy was not a "split-dollar" policy. [18] On this part of this issue, we hold for petitioners. Petitioners are taxable with respect to the Shenandoah policy in 1972 only to the extent of $527.70, that part of Palumbo's "split-dollar" obligation which he did not pay. In 1973, petitioners are not taxable on any part of the premium on this policy. [19]
Petitioners on brief now contend for the first time that their taxable income should be reduced by the premium paid by Palumbo in 1973. This issue was not raised in the petition or the stipulation and comes too late now. Aero Rental v. Commissioner,64 T.C. 331, 338 (1975). Real Property Investors, Inc. Travel Expense
Real Property Investors, Inc. (RPI) is a Virginia corporation formed in 1972, all of the stock of which is owned by petitioners *107 Palumbo. The corporation was on the date of trial in existence and still doing business. [20] RPI, in 1972, was a general partner and 25-percent owner of a limited partnership engaged in the motel business. During Colter's fiscal year 1973 it owned an aircraft. All of the operating expenses of the aircraft were deducted by Colter for tax purposes. Respondent determined that Palumbo received dividend income in the amount of $10,997.16 during Palumbo's 1973 taxable year for expenses of the operation of the aircraft on PRI business. This adjustment is based on a stipulated exhibit which is a statement on Colter stationary entitled "Statement to RPI" which lists the apparent costs of a number of trips starting in November 1972 through March 1973, the total of which is the sum of $10,997.16. Next to this sum appears the word "DUE." The parties have also stipulated that at least five of the trips were made on behalf of Dunn International, a corporation in which Palumbo held no stock or financial interest but was an unsalaried vice president. Another stipulated exhibit, also on Colter stationary, is headed "ACCOUNTS RECEIVABLE AS OF APRIL 30, 1974." One of the two items listed is "Real *108 Property Investors, Inc. (Florence Motel)" with the amount in issue here. There is no evidence as to the source or purpose of either of these documents. The parties have also stipulated that Colter's financial statement as to April 30, 1973 lists no receivable from RPI. The record is silent as to the fiscal 1974 financial statement, if one was prepared. This record is also silent as to Colter's account receivable journal. We assume that if such evidence had been presented to us, it would be unfavorable to petitioners. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). While some of these trips may have been related, in part, to Colter business, at least some trips appear to have also been related to non-Colter business. There is no basis for any allocation between the two. As to other trips, the evidence is too vague and *109 indefinite to permit us to make any factual finding. [21] We do find that two trips were solely Colter business, those on February 24 and February 28, 1973, aggregating $742. Petitioners principally complain that the evidence upon which respondent based this adjustment is "very thin." We agree, but the burden of proof is upon petitioners not respondent. Rule 142(a). Petitioners also argue that Colter's books do not show any receivable due from RPI, and we agree. Neither is there evidence of a receivable due from Dunn International. But if Colter's plane was being used on RPI business or Dunn International business, with no Colter business connection and no intention to secure reimbursement from either corporation, petitioners' case is not helped. Palumbo himself apparently was a passenger on many of the trips and certainly must be considered to be responsible for use of *110 the plane on the business of these two corporations. The fact that insurance may have been sold to people "who were contemplating doing business with Dunn International" is insufficient to make trips on Dunn International business the business of Colter. Except for the two trips above noted, we simply do not find on this record a sufficient basis for concluding that petitioners have overcome the presumption of correctness attached to the statutory notice. Petitioner rely on three decisions by this Court, Rapid Electric Co. v. Commissioner,61 T.C. 232 (1973); Ross Glove Co. v. Commissioner,60 T.C. 569 (1973); Schwartz v. Commissioner,69 T.C. 877 (1978). These cases stand for the propositions that transfers between related corporations can result in constructive dividends to their common shareholders and that the extension of credit is the equivalent of the transfer of cash but that common ownership alone is not sufficient to justify treating intercorporate transfers as constructive dividends. A constructive dividend arises only where the expenditures are for the shareholder's personal benefit, which benefit must be more than *111 incidental. Schwartz v. Commissioner,supra at 884. We do not disagree with petitioners' authorities. But they do not warrant ignoring the burden of proof. We hold for petitioners to the extent of $742. This adjustment is, therefore, reduced to $10,255.16. Note Payment
Respondent determined additional dividend income to Palumbo in 1973 in the amount of $2,921.43, alleged to be "the net amount" which Colter paid on an obligation of Palumbo at Virginia National Bank of Charlottesville, Virginia. The payments were made on a Colter renewal of an obligation which respondent contends was that of Palumbo. One of the stipulated exhibits indicates that the note involved was a note of Colter made in 1972 in the amount of $15,000. Another exhibit indicates it was a renewal of a prior obligation in the same amount which apparently arose out of an endorsement of a third-party loan. Another stipulated exhibit is a copy of the work papers of one of respondent's agents which purports to show how the adjustment was derived. We have previously commented on the difficulties faced by the Court with respect to items in the stipulation. The stipulation recites generally *112 that "the following statements may be accepted as facts." The specific item in the stipulation recites that the particular exhibit is "a copy of respondent's explanation," together with work papers. We interpret this part of the stipulation to mean simply that the exhibit is a correct copy of the agent's work papers. We do not interpret the stipulation to accord evidentiary weight to obscure and cryptic notations by the revenue agent in these work papers to the effect that the $15,000 renewal was of a personal note of Palumbo. That aside, however, and assuming that the agent's work papers are to be taken as evidence in the case, they appear to show merely that an error was made by Colter in not charging Palumbo for all payments made on his behalf. The revenue agent concluded that Palumbo was charged with $11,078.56 whereas he should have been charged with $13,999.99. There is no indication that Palumbo caused the error or was even aware of it and the error appears to have arisen out of an aggregation of a number of different charges and credits with respect to different matters. The facts before us simply do not meet the test of a constructive dividend to Palumbo. See, e.g. *113 , Jobusch v. Commissioner,68 T.C. 929, 942-943 (1977), affd. sub nom. Friedman & Jobusch v. Commissioner,627 F.2d 175 (9th Cir. 1980). While respondent argues that petitioners have not discharged their burden of proof, we disagree. The evidence shows that, if and to the extent that a bookkeeping error was made, it was done without any intent to divert Colter funds to Palumbo. We are also satisfied that the renewed obligation was not a personal obligation of Palumbo. Legal Expense
Two items comprise this adjustment, the amount of $1,985 which was actually a commission adjustment in connection with insurance on the life of Roland which has been discussed by us under the heading "Commission Adjustment" and the amount of $5,500 apparently comprising a portion of legal fees in the amount of $7,885 paid by Colter to a Richmond law firm and a Washington law firm for legal services in connection with the grand jury investigation of Palumbo arising out of the Regan matter. Although the statutory notice does not so indicate, we assume that respondent simply made an allocation of this aggregate sum between Colter and Palumbo. The record does not *114 indicate the nature of the services of either law firm. Petitioners ignored this issue on their original brief and in their reply brief merely assert, without anything in the record to substantiate their contention, that the legal services were as much a benefit to Colter as to Palumbo. The record clearly shows that Palumbo himself was involved in the grand jury investigation. Whether or not it extended in any fashion to Colter, or could have or did adversely affect Colter, is purely a matter of conjecture. Petitioners have failed to carry their burden of proof. Rule 142(a). Farm Losses
On the 1972 income tax return of petitioners Palumbo, a deduction was claimed on Schedule F for a farm loss in the amount of $4,507.05 which was composed of repairs and maintenance, supplies purchased, and utilities in a total amount of $3,035.69 and depreciation of a one-third interest in a herd of cows and a one-half interest in a bull in a total amount of $1,471.36. At the commencement of the trial respondent conceded that petitioners were entitled to the loss claimed on petitioners' 1973 income tax return in the amount of $4,227.46 on the sale of their interest in the cattle. That *115 loss deduction took into account depreciation allowed or allowable in the amount of $4,349.78 which we assume included the depreciation claimed on the 1972 return, which was disallowed by the statutory notice. The only testimony related to the farm loss issue pertains to the expenses aggregating $3,035.69 and both parties on brief have argued that item as though it was the only adjustment in dispute. In the stipulation, depreciation is clearly treated as an element of Colter loss. We, therefore, treat the concession by respondent as including not only the actual loss on the sale in 1973 but also the depreciation disallowed on the 1972 return. With respect to the farm loss, the only issue raised by respondent is with respect to substantiation. It is the only substantiation that either party has focused on during the trial and on brief. Directing our attention to the evidence before us and the testimony with respect to that evidence, we find the testimony credible but inconclusive with respect to a number of items. On the assumption that the farm is a trade or business, which the parties apparently have assumed, we are satisfied that petitioners Palumbo incurred some deductible *116 expenses, although not in the amount claimed. Exercising our best judgment and applying the rule of Cohan[22] we find that petitioners are entitled to a deduction in 1972 for expenses in connection with the farm in the total amount of $2,055.43. Additions to Tax for Fraud and Negligence
For the years 1972 and 1973, respondent has determined that the addition to tax for fraud under section 6653(b) should be imposed and for the years 1974 and 1975 the addition to tax for negligence under section 6653(a). Under section 6653(b) respondent has the burden of proof by clear and convincing evidence. Section 7454(a); Rule 142(b). To meet this burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3rd Cir. 1968); Rowlee v. Commissioner,80 T.C. 1111 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), *117 affd. without published opinion, 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard v. Commissioner,69 T.C. 391 (1977). Fraud is not to be imputed or presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Otsuki v. Commissioner,53 T.C. 96 (1969). Fraud may be proven by circumstantial evidence and the taxpayer's entire course of conduct may be examined. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106 (1969). However, the mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962). In this case it is quite clear that there are substantial deficiencies in income tax for all 4 years, not just for the years 1972 and 1973. Moreover as we have found, there is little variation in the conduct of business by Palumbo (both Colter business and non-Colter business) during any of the 4 years. To the extent that the handling of the loan account by Palumbo, by Colter's employees, and by the Accountant warrants an addition for fraud, as respondent argues, the account *118 balance at the end of Colter's 1975 fiscal year was the highest of any year between 1966 and 1977. Yet as to 1975 only the negligence addition was imposed. With respect to the erroneous credits, again there is little, if any, material difference among the 4 years. There is nowhere in this record a shred of evidence to excuse the grossly negligent bookkeeping and tax return preparation which characterizes each of these 4 years but neither is there a shred of evidence which indicates that Palumbo instigated that collective negligence with the requisite "specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941). Whether or not Colter's practice of paying premiums for insurance customers out of its commission income is typical or atypical of the practices of other life insurance agents we do not know.This practice was reflected on Colter's books and it appears to have contributed to Colter's ability to place on its books a very large volume of insurance business. It is difficult for us to believe that the insurance companies for which Colter wrote insurance were not aware to some extent of Colter's and Palumbo's *119 practices in this regard but that is substantially irrelevant. It also appears on this record that Colter or Palumbo acting for Colter, in some instances, may have rebated premiums to insureds ostensibly in the form of loans or gifts which practice may be illegal. While an illegality, if it were such, might be a factor to be taken into account in determining the propriety of the fraud addition, it does not assist respondent in this case. The same is true with respect to Palumbo's participation in apparently illegal conduct in connection with his dealings with his brother-in-law Regan. We do not, however, find in those dealings clear evidence of a intent to evade the payment of income taxes. No useful purpose would be served by further reviewing the issues in this case which we have heretofore treated. Although it is a close call, respondent has simply failed to convince us that Palumbo's conduct in the years 1972 and 1973 warrants the imposition of an addition to tax under section 6653(b), especially when that conduct does not seem to have varied materially during any of the 4 years before us. Negligence, no matter how gross, does not rise to the level of an intent to evade *120 tax. As we have said, "Although the bookkeeping was inadequate by any standard, there is no evidence of intentional concealment or deliberate misrepresentation." Iley v. Commissioner,19 T.C. 631, 635 (1952). We also say again, as we said in an earlier case: Negligence, careless indifference, or disregard of rules and regulations would not suffice [for fraud]. The petitioners dismissed their responsibility to file proper returns much too lightly. But the Commissioner, to support the fraud penalties, must prove by clear and convincing evidence that the taxpayers, or one of them, intended to defraud him. [Ferguson v. Commissioner,14 T.C. 846, 849 (1950).] While Hoover and his firm appear to have contributed materially to the incorrect tax returns by their apparent indifference to accuracy and their stretching of facts to suit their tax theories, there is nothing to indicate any bad faith on their part and there is no suggestion in the record that facts were misrepresented to, or concealed from, the Accountant. The question of the negligence addition is more easily determined. The cases discussing the criteria for negligence are legion *121 and need not be repeated here. Suffice it to say, as we have found time and again on this record, Palumbo himself and all of Colter's employees and Palumbo's independent certified public accountant have, in our judgment, been guilty of gross negligence in record keeping, in making adjusting entries at the end of the year, and in the preparation and filing of tax returns for all 4 years. What mystifies us is why respondent chose not to impose the addition to tax for negligence under section 6653(a), at least as an alternative, for the years 1972 and 1973. Unfortunately, we cannot do so on our own motion. Petitioners' arguments against the negligence addition are that they relied fully and completely upon the Accountant in the preparation of their tax returns and they relied on the acceptance by respondent of those tax returns in prior years. As authority for this latter proposition petitioners cite only a 1955 Memorandum Opinion of this Court. In this case ( Estate of Phillips v. Commissioner,T.C. Memo. 1955-139, revd. on another issue 246 F.2d 209 (5th Cir. 1957)) we held merely that respondent's actions in prior audits was sufficient to negate *122 the presumption of correctness attached to the statutory notice and shifted to respondent the burden of going forward with evidence of petitioners' negligence. Here, there is in our judgment more than ample affirmative evidence of negligence. With respect to the theory that reliance upon advisors will negate negligence, and there are a number of cases in which we have so held, petitioners have blatantly ignored the fact that there are limitations on this rule. The general rule is that the duty of filing accurate returns cannot be avoided by placing responsibility on an agent. * * * There is, however, an indication in some cases that a petitioner may insulate himself from the negligence addition to tax if he furnishes the necessary information to his agent who prepared the return. * * * Petitioner must bear the ultimate responsibility for any negligent errors of his agent. [Citations omitted.] [Pritchett v. Commissioner,63 T.C. 149, 174 (1974).] See also American Properties, Inc. v. Commissioner,28 T.C. 1100, 1116-1117 (1957), affd. 262 F.2d 150 (9th Cir. 1958). In the case before us, petitioners cannot escape their *123 liability for the many errors in their tax returns. Petitioners Palumbo had the basic and affirmative obligation to maintain adequate records for their accountants' use in tax return preparation.As Hoover himself testified, Palumbo was not careful in distinguishing between personal and corporate business. And it very clearly appears that the information furnished to the Accountant was often incomplete and perhaps (or probably) misleading. We cannot put the entire blame upon Palumbo personally, however. In many respects the several members of the independent accounting firm must share the charge of negligence, for which again petitioners bear ultimate responsibility. One example will suffice. As we have found, when the RCI stock was transferred to Palumbo in connection with RCI's assumption of certain obligations of Remote, the obligations fell into three categories: the $200,000 SBA loan which Palumbo personally guaranteed, $117,000 in key man insurance premium loans, and $19,000 owed to Palumbo personally. Palumbo was personally obligated, we believe, to explain this transaction fully to the Accountant, but again Mr. Hoover testified that the propriety of Colter paying Research's *124 debts was not questioned because he "presumed" that it was related somehow to sales of key man insurance to Remote. He again explained that the financial transactions moving from Remote to Colter were never satisfactorily explained although he did know that Colter did not acquire the Research common stock. The collective failure of the members of that accounting firm to investigate the basis for Colter's payment of Research's debts as a Colter business transaction was negligent. That the Palumbos allowed this treatment to be incorporated into their tax returns was an "intentional disregard of rules or regulations." They must have known that the Accountant was using as their justification for this treatment the tenuous connection of sales of life insurance on Remote executives. Palumbo cannot explain away his involvement in Remote and in Research as merely assisting an insurance customer in order to sell life insurance. An equally egregious illustration of callous disregard for proper tax return preparation on the parts of both Palumbo and the Accountant is the matter of allowing the Palumbos to take credit on their tax return for income taxes improperly withheld by Shenandoah while *125 treating the commission income as belonging to Colter. We rest our finding on the facts placed in the record by both parties. We hold for petitioners on the fraud addition for the years 1972 and 1973 [23] and for respondent on the negligence addition for the years 1974 and 1975. Addition to Tax Under Section 6651(a
The final issue is whether or not for the year 1975 petitioners are liable for the failure to file addition under section 6651(a). It is not disputed that petitioners Palumbo received an extension of time to file their return for the taxable year 1975 to August 15, 1976, which was a Sunday. The return in question was actually received by the Service Center on August 19, 1976. The face of the return recites that it was prepared on August 11, 1976 and signed on August 14, 1976. But the dates inserted on the return to not necessarily prove that the signatures were affixed on those dates. There is no evidence whatsoever as to the date on which the return was placed in the mail, the identity of the person who mailed it, or even that it was mailed to the Memphis Service Center. Petitioners argue *126 that respondent has not offered any evidence that the Palumbos had not mailed their return prior to midnight on August 15. Petitioners ignore again the fact that the burden of proof is on petitioners Palumbo in this instance not upon respondent. Petitioners Palumbo made no effort to place before the Court any evidence to show that they are not subject to this addition to tax. We, therefore, hold for respondent with respect to the addition to tax under section 6651(a). Decisions will be entered under Rule 155.
APPENDIX A Colter Loan Account
Account balance at
Net change in account
end of year - figures
at end of year - figures
in ( ) indicated
in ( ) indicate net
corporate liability
reduction in petitioner's
Date
to petitioner
liability to Colter
4-30-66
$3,000.00 $3,000.00 4-30-67
(15,500.00)
(18,500.00)
4-30-68
24,918.61 40,418.61 4-30-69
10,680.58 (14,238.03)
4-30-70
(14,711.97)
(25,392.55)
4-30-71
4-30-72
124,110.61 149,503.16 4-30-73
279,591.16 155,480.55 4-30-74
241,329.21 (38,261.95)
4-30-75
399,146.81 157,817.60 4-30-76
61,397.44 (337,749.37)
4-30-77
(1,430.14)
(62,827.58)
*127 Footnotes
1. The following cases were consolidated for trial, briefing, and opinion: Joseph C. and Sandra C. Palumbo, docket No. 14600-79; and Colter Corporation, docket Nos. 4283-81 and 4284-81.↩
2. Petitioners Palumbo filed their Federal income tax returns on the calendar year basis and Colter filed its returns on a fiscal year ending on April 30. ↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Neither the stipulations nor either party on brief follows the order of presentation of issues in the statutory notices. We have arbitrarily followed the order of discussion in petitioner's original brief, except where indicated.↩
5. Hoover has been an associate and advisor of Palumbo for many years and his accounting firm has done all accounting work (other than bookkeeping by Colter employees) for Colter and petitioners Palumbo. References in the text to the "Accountant" refer generally to the accounting firm and not necessarily to Hoover. References to Hoover refer only to him.↩
6. We cannot determine on this record what significance the parties intended to attach to the use in the stipulation of the words "so-called divisions." The evidence reflects that for legitimate business reasons Palumbo concluded it was necessary for Colter to use trade names for certain aspects of its life insurance business since Colter sold policies for at least five different insurance underwriters.However, this ambiguous terminology is irrelevant except as the existence of a division, such as Nespal Company, reflects the contemporaneous treatment by Colter and the Palumbos of that particular business.↩
7. The stipulation is that one of Colter's "so called divisions was Nespal, a joint venture." Nespal could not have been a joint venture subsequent to the fall of 1973 when Nesbit withdrew, unless Palumbo had engaged in a joint venture with Colter.↩
8. We make this finding notwithstanding a contrary unsworn statement by Palumbo made to some of respondent's agents in 1974 and notwithstanding an affidavit by Nesbit which the parties have stipulated should be treated as testimony. Testimony under oath before the Court is more convincing then a transcript of an interview with a special agent. Nesbit did not testify and while the affidavit states that he dealt with Palumbo "on an individual basis" we deem his statement to be inconclusive, especially since compensation for his activities was paid by Colter to his own corporation. There is no explanation in this record for Palumbo's statement to respondent's agent. Palumbo was not questioned about that statement by either counsel during the trial.↩
9. See footnote 5, supra.↩
10. These sums are reflected on Forms 886-A attached to the statutory notices as advances in excess of amounts credited as repayments. Petitioners on brief have characterized these four adjustments as reflecting "the net increases in the loan account" whereas respondent characterized the adjustments as "advances that petitioner Joseph C. Palumbo received in excess of the repayments." The actual increase in the loan account, as reflected in this record, is materially different from these adjustments. Based upon a work paper of one of respondent's agents, respondent, for reasons which are not clear, has limited this particular adjustment to the excess of Colter payments to Palumbo, Colter payments of insurance for Palumbo and rent account payments to Palumbo over Colter payments from Palumbo and rent account payments from Palumbo. This joint exhibit, described in the stipulation as "a Summary of the Net Increase" in the loan account for the years 1972, 1973, and 1974 reflects the constructive dividend figure included in this item of respondent's determination only for the year 1972. We cannot account for this discrepany but it does not affect our disposition of the adjustments.↩
11. Respondent on brief requests us to find that Colter deducted as a commission adjustment its second-year commission in the Gardner policy and that this sum was diverted to Palumbo. Petitioner does not object. Hence, we infer that the second-year commission was applied on the premium.↩
12. The parties stipulated in part as follows: "The total of premiums on the four policies was $19,425.00, of which Colter Corporation paid the sum of $13,425.00." A memorandum by a special agent of an interview with one of the cousins quotes the cousin as saying that Central Produce, Inc. received from Colter two checks totaling $13,425. The stipulation states that this memorandum "can be considered as testimony," an ambiguous statement at best. In this state of the record we decline to make any find as to whether Colter rebated part of its commission to Central Produce, Inc. as owner of the policy or paid that sum to American Defender. Respondent makes no contention that premium rebates may have been illegal or not ordinary or customary, perhaps because Colter's case has been settled. Neither does respondent explain why this commission adjustment was treated as part of a credit to the loan account, which it was not.↩
13. It has been called to our attention by petitioners that interest payments by Colter have been attributed to Research which had no income. This seems a harsh result but petitioners have not asked us to consider whether Colter payments of interest should be treated as interest when attributed to Palumbo as part of a constructive dividend. Also, Research assumed at the time Palumbo acquired its stock, $117,000 in obligations of Remote to banks in connection with key man insurance on policies handled by Colter. At least some of this obligation was guaranteed by Colter. As we have found in our discussion of other issues, as a customary part of the way it did business, Colter, as well as Palumbo on Colter's behalf, frequently endorsed notes reflecting the financing of premium payments by the owners of the insurance policies sold by Colter. Thus, to the extent that any of Colter's payments of Research's indebtedness were actually payments on the assumed bank loans which financed premiums, which loans initially were either endorsed by Colter or by Palumbo for Colter, we question whether such payments should be treated as dividend income to Palumbo on this record. Colter, as to such payments, would have been a guarantor of the original Remote obligation, thereafter assumed by Research, but the mere fact that Palumbo ended up as the owner of Research may not warrant treating such payments as dividend income to Palumbo. However, we understand the stipulation to remove from our consideration any issue as to how that matter should be adjusted between Research, Palumbo, and Colter.↩
14. Although the stipulation does not state whether or not this check was cashed by Palumbo, both parties have so stated on brief, hence we will assume that to be the fact.↩
15. This argument is contrary to Colter's action in charging $35,000 to the loan account. ↩
16. The record contains almost 30 pages of largely illegible grand jury testimony apparently related in part to Trans-Ocean Steel. Much of that part of the testimony which we can decipher is hearsay. As we have noted before, the parties stipulated that this testimony "can be considered as testimony in this matter." We decline the parties' invitation. Petitioners do not contend that the payments to Calabrese were deductible under section 162; their contention is only that Palumbo was a conduit as to Calabrese. Palumbo was not interrogated on this issue during the trial.↩
17. See Rev. Rul. 64-328, 1964-2 C.B. 11↩.
18. The fact that Palumbo paid the second-year premium of over $14,000 when his obligation under the "split-dollar" policy was less than $3,000 itself casts grave doubt on whether this was, in fact, "split-dollar" insurance. ↩
19. We note that petitioners on brief conceded the Bankers Security and the American Defender adjustments.↩
20. In one paragraph of the stipulation the parties agree that all the stock "is owned" by the two individual petitioners. In the next paragraph, the parties stipulate that in 1972 Palumbo was the sole stockholder. We do not think this discrepancy is material.↩
21. Other than the stipulated facts, the evidence on this issue is Mrs. Palumbo's testimony with respect to the statement which detailed the trips. Her testimony was largely based upon the destination of the plane as shown and her knowledge of "What business we had in that particular city at that time."↩
22. Cohan v. Commissioner,39 F.2d 540, 543-544↩, (2d Cir. 1930).
23. Respondent conceded the fraud issue as to Mrs. Palumbo.↩